JOHN B. ALLEY vs. ISAAC S. LYON.

{ Decided February 16, 1885.
{ The CHIEF JUSTICE and Justices MAC ARTHUR and JAMES sitting.

EQUITY. No. 8494.

By an ordinance of the common council of Washington a special tax was laid to defray the costs of certain street improvements. The tax was imposed and levied on all lots and parts of lots bordering on the line of the improvement. By the provisions of the ordinance the manner of assessment was to be as follows: The assessors were to sum up the aggregate cost of the work, and to state the amount due from each lot. This assessment roll was then to be deposited with the register, who was to place it in the hands of the collector, whose duty it then became to place it upon record in the tax ledger, kept in his office, and notify the parties of the amount due from each, within thirty days after receiving the assessment roll. Certain lots bordering upon the line of the improvements were omitted from the assessment roll at the time of making the assessment and of depositing the roll with the register, which was in November, 1870. In October, 1871, the owner of the omitted lots conveyed them to K., a *bona fide* purchaser, who purchased without knowledge of any lien and after searching the assessment rolls and finding no assessment against the lots. One month after his purchase they were entered on the assessment rolls by a memorandum in red ink stating that they had up to this time been omitted. After this entry was made K. conveyed to L. who conveyed to S., and he to the plaintiff, who took and recorded his title some time in April, 1881, long after the entry in red ink had been made.

*Held*, That K., having exercised all the diligence required of a *bona fide* purchaser in searching the assessment rolls at the time of his purchase, took the property free and clear of the tax, and that his grantees took the same title although purchasing with knowledge of the later entry.

STATEMENT OF THE CASE.

This was a bill in the nature of a bill of peace.

The bill set forth that complainant was the owner of lots 1 to 12, inclusive, in square 156, in the city of Washington, in fee simple and derived his title from Thomas Young and wife, through deeds from Young to Kilbourn, Kilbourn to Latta, Latta to Sunderland, and Sunderland to Alley.

That lots 1 to 12 were subdivided and Alley conveyed parts thereof to various grantees, who in turn conveyed parts to other parties, and that Alley and those claiming under him have been in actual continuous possession; that Alley is bound to make good the title to the parts conveyed

57

by him, and therefore brings this suit in his own name and for those claiming title under him.

That Henry Birch, April 1, 1870, set curbstones and paved gutters and sidewalks on the north side of P street between Sixteenth street and Rock creek, under a contract with the corporation of Washington, and that the same was approved November 17, 1870. That the defendant claims that an assessment was made therefor, and on March 9, 1872, four certificates were issued by the Board of Public Works for the tax and assessment amounting to $2,054.10, which board succeeded on February 21, 1871, to all the rights and duties of the corporation of Washington; that said certificates were assigned by Birch to the defendant for a valuable consideration, and that afterwards a Board of Commissioners having been created, the defendant called upon the collector of taxes to sell said lots to pay said tax and that the sale was made in 1881, at which Lyon became the purchaser thereof, paying for the same with the said certificates and receiving twelve certificates of sale, and that under the same he now claims to be the owner of said lots.

The complainant denies the foregoing claim and states:

That no lawful assessment for said tax was ever made, that an assessment and a record thereof was made for the cost of said improvements upon adjacent property, but not upon these lots and no record of any such assessment was made, kept or found in the books or offices where the same should be, in order to give notice thereof, but on November —, 1871, the pretended assessment, relied upon by said Lyon, was entered and a note was appended as follows:

"This work was done at this date, but on request of the owner, not entered until November, 1871.

"WILLIAM FORSYTH,
"Surveyor, D. C."

That complainant does not know who made this entry, but Thomas Young was at the time owner of said lots, and complainant believes that entry was collusively made by procurement of Birch, but without knowledge of Alley or

his grantors, and after the conveyance to Kilbourn; that Kilbourn and his grantees were innocent purchasers, without notice of said entry, or of said certificates, or of any lien on said property for said improvements, and a search of the records of the corporation of Washington, where said assessment lien should be kept, was made, but no such record was found.

That the page on which the entry was made was a completed record, and when completed was signed by the officers required to certify to the same; that the entry was made over the said signatures after they had ceased to be officers, and the corporation had ceased to exist, and that the assessment was null and void since, as Lyon and Birch well knew.

That by section 37, act of February 21, 1871, the Board of Public Works was created, and had control of street paving and other improvements, and, to defray the cost of such work, were required to assess a reasonable amount, not exceeding one-third of the cost upon the property benefited thereby. That said assessment, if made at all, was made thereafter for the full cost of said improvement.

That on June 20, 1874, the Board of Public Works was abolished, and their authority vested in Commissioners, but neither the Commissioners nor the Board of Public Works made any assessment for said improvements; that the collector of taxes attempted to sell said lots to pay said tax, but was enjoined from so doing by a restraining order, granted in equity cause No. 4450, Latta *vs.* District of Columbia and John F. Cook, collector, which order is still in force, and Lyon, the District and the collector had full notice thereof.

That in 1881 Lyon again applied for a sale of said lots, and said lots were sold by said collector, and Lyon became the purchaser thereof, and paid for the same with said four certificates, and received twelve certificates of sale, notwithstanding said restraining order, and the original certificates were surrendered and cancelled.

Complainant had no knowledge of said sale until after-

wards, and then applied to Lyon to surrender said certificates of sale and discharge said lots from the cloud upon his title created by said certificates, which defendant refused to do.

That said claim creates a cloud upon the title of complainant, which compels him to give bonds of indemnity, and while defendant has not brought actions of ejectment or other possessory actions, he holds said claim as a menace upon said title.

Complainant prays for subpœna and answer; that said assessment be decreed to be void, and said certificates to have been issued without authority of law, and that they create no lien; that said sale be declared to be illegal and void, and the certificates issued thereunder be decreed to be void and no evidence of title, and that Lyon may deliver up the same for cancellation, and that he and his assigns be enjoined from using or setting up the same.

The answer admitted the ownership of Alley, the conveyances by him, and his liability to defend the title, as stated in the bill.

It admitted that Lyon claims title to said lots, and sets out the act of the corporation providing for the paving of P street north, approved November 2, 1869, the act of Congress of February 23, 1865, giving the corporation power to levy taxes for such improvements; that the corporation, in order to carry into effect this act of Congress, re-enacted the act of May 23, 1853, in relation to paved footways, and the acts of June 10, 1867, and October 28, 1867, providing for the mode of assessing said taxes by a superintendent, and the collection of the same, one-fourth in thirty days, and the remainder in one, two and three years, and the issuing of certificates for the deferred payments. That Henry Birch set the curbs and paved the sidewalks on said street, and that the work was accepted November 17, 1870, and the cost thereof for said lots 1 to 12 was $2,054.10.

That the assessment therefor was duly made, but not entered until November, 1871; that on November 17, 1871, the collector of taxes entered said assessment on a special

tax ledger in his office, and issued due notice to the owner of said lots.

That on March 9, 1872, four certificates were issued to Birch for the payment of said work, and were meant to be a lien upon said property according to law, and were accepted by him as such in good faith; that afterwards Lyon purchased the same for value without notice of any defect, and no part thereof has ever been paid.

That Lyon afterwards applied for the sale of the lots under said certificates, but was put off until 1881, when the same were sold, and he purchased them with said certificates and received twelve certificates of sale.

That the bill in cause No. 4,450, was filed to enjoin the sale of certain other property in which Lyon had no interest, for certain taxes for work done by George Neitzey, and that an amended bill was filed by Latta, so as to embrace said lots 1 to 12, averring that work to have been done by George Neitzey after the corporation had ceased to exist. A preliminary restraining order was issued, but no hearing was ever had, neither Birch or Lyon were parties, and Lyon never had any knowledge of the same, and there was no note thereof in the office of the collector of taxes.

The answer further denied that the assessment was collusively made, or that it was made with the knowledge of Birch; and that Kilbourn and his grantees were innocent purchasers. It averred that Kilbourn knew that Birch had done the work, and that his grantees could have found the record in the office of the collector of taxes, and they therefore took title with constructive notice thereof.

It denied that the entry by Forsyth, after the sheet had been signed, invalidated the assessment; that the law did not require the signature of the mayor to an assessment, but only that of Forsyth, who was then surveyor as well as superintendent; that the same was made by him as required by law, to the collector of taxes, who entered the same of record against the property. That the act of the corporation created the lien, and all persons were bound to know it. It denied that the law of February, 1871, was applicable

to this assessment, and averred that Alley knew of said assessment at the time of his purchase, and afterwards received $772.32 for old material put there by Birch, and he is thereby estopped from denying the validity of the lien.

Lyon also filed a cross-bill, setting out the same facts as contained in his answer to the original bill, and in similar form, and prayed that the amount of said certificates be decreed to be a lien on said lots, and that Alley be decreed to pay the same.

The answer to the cross-bill set out the facts stated in the original bill, and referred to the same. It asserted the invalidity of the alleged assessment, the original certificates, the pretended sale, and the twelve certificates of sale, and denied that the said lots are subject to said lien, or that Alley is liable for or should be required to pay the same.

Replications were filed, and for the hearing on the original and cross-bills, the following facts were agreed on by a stipulation filed in the cause:

1. That complainant has given bonds of indemnity to said purchasers of portions of said real estate from him to indemnify them and their respective heirs and assigns, from any loss by reason of the matter involved in this suit.

2. That said lots 1 to 12 inclusive, front on the north side of P street north, between Seventeenth and Eighteenth streets west, being on the north side of P street north, between Sixteenth street and Rock creek, and located in what was formerly designated as the first ward of the city of Washington, District of Columbia.

3. On April 1, 1870, the corporation of Washington duly contracted with Henry Birch to set the curbstones and pave the footways and gutters in the first ward of the city of Washington for the year beginning April 1, 1870, and between that date and November 16, 1870, said Birch executed said contract and performed said work on said north P street, bordering upon said lots 1 to 12, and the same was duly accepted by said corporation. The cost of said work bordering upon said lots to be paid said Birch was $2,054.

4. William Forsyth, at the time said work was done by

said Birch, was the superintendent and inspector of the paving of carriageways and footways under the corporation of Washington, under the act of June 10, 1867, and it was the duty of said Forsyth to enter on a sheet or page of the ward-book of said city the measurement of said work and the cost thereof apportioned against the several lots, from which the collector of taxes entered in the special tax ledger in his office the amount as entered against said lots.

That complainant's Exhibit No. 1, filed with the original bill, is a true copy of the entries in the ward-book relative to the work done by said Birch under said contract. That at the time the same was signed by the mayor, the superintendent of streets, and the commissioner and assistant commissioners of the ward, the entries therein in red ink were not on the same, but that said entries had been withheld therefrom and were not placed thereon until November, 1871, as appears therefrom, at which time said Forsyth was the surveyor of the District of Columbia. That upon the making of the said entries relative to said lots from 1 to 12 in November, 1871, the collector of taxes of the District of Columbia entered the amounts in said special tax ledger in his office, as assessed against said lots from 1 to 12, and served the notice thereof.

5. That, to wit, on March 9, 1872, the four certificates of indebtedness signed by the governor and register of the District of Columbia against said lots from 1 to 12 of which exhibit I. S. L., Nos. 1, 2, 3 and 4, are true copies, were issued and delivered to said Henry Birch who sold and transferred the same to the defendant Lyon for value before maturity.

6. That said Lyon, after said certificates had become due, sought to have said lots sold by the collector of taxes for the payment thereof, and finally said collector of taxes for the District of Columbia did advertise, and, on or about October 5, 1881, did sell said lots from 1 to 12 at public auction for the non-payment of said certificates, at which sale said defendant Lyon became the purchaser of each of said lots, and there was then issued to him, upon the sur-

render by him of said certificates of indebtedness (which have been cancelled) and the payment of a small sum in cash, the twelve certificates of tax sale, true copies of which are filed with the answer herein marked Exhibits I. S. L., Nos. 5 to 16 inclusive.

7. That no part of said sum of $2,054.10 has ever been paid.

8. That the record and proceedings in said equity cause No. 4450 be considered as in evidence herein. That the collector of taxes upon the service of the restraining order issued in said cause, made no entry or memorandum of the same against lots 1 to 12 in square 156, but by mistake entered the same in his office as applying to lots in square 256.

9. The District of Columbia having made some alteration in the grading and paving of P street in front of said lots, the complainant, in 1882, applied for and received from the District the sum of $772.32, for the appropriation by it of the material put there by the said Birch under his said contract.

10. That there was issued to Henry Birch, on January 13, 1871, fifty-two certificates of paving stock, being for four installments of taxes for cost of said improvement, and which bore interest from November 16, 1870, at ten per cent., and which were signed by the mayor of the city of Washington, and which covered the entire amount of taxes for this improvement appearing at that time on the assessment roll.

11. That all acts of Congress and acts or ordinances of the late corporation of Washington having, in the opinion of counsel, any bearing hereon are to be considered as in evidence, and may be read at the hearing.

It was also agreed that Henry Birch, if called as a witness, would testify as stated in the affidavit annexed, and that the same should be read at the hearing as far as competent and relevant.

AFFIDAVIT.

Henry Birch, being duly sworn, deposes and says, that, under and by virtue of public invitation on the part of the mayor of the city of Washington, D..C., for proposals for setting the curbstones, paving the footways, gutters and alleys in the first ward of said city during the year 1870, affiant submitted proposals for doing such work for and within said first ward, and was duly awarded the contract therefor. That in accordance with act of corporation of said city (67 Council, chap. 236), approved November 2, 1869, affiant was directed to set the curbstones and pave the footways and gutters on the north side of P street north, between 16th street west and Rock creek.

Lots 1 to 12, inclusive, square 156, then owned by Thomas Young, were within said first ward, and bordered on the line of this improvement.

That affiant, as contractor, set the curbstones and paved the footway and gutters in front of and abutting said lots 1 to 12, inclusive, square 156, and that this work was done by him and finished in a good and workmanlike manner during November, 1870, under the supervision of the commissioner and two assistant commissioners of improvements of said first ward, and the same was accepted by them and duly measured by William Forsyth.

That during the progress of this work Thomas Young, the then owner of laid lots 1 to 12, square 156, promised in person to pay affiant in full for the improvement of said lots when the work should be finished and measured, provided affiant would deduct ten per centum from the contract price thereof. Affiant agreed to this arrangement, as this requested reduction was less than the usual discount then made by him and other contractors when disposing of the assessment certificates, or scrip issued to them in payment for such work. Moreover, affiant believed such promise would be carried out in good faith, as he had before this time improved lots belonging to said Thomas Young, and had been by him paid cash therefor, after such ten per cent.

59

discount, at the completion and measurement of this work.

That soon after completing this improvement in front of said lots, Thomas Young sent for affiant to come to his house, but affiant did not go at the time, but went a few days afterwards, when he found Thomas Young had left the city on account of ill health. He, Young, remained absent a considerable time, and upon his return called upon affiant, this being the first time affiant had met him since finishing said work, when affiant was informed by said Thomas Young that the Board of Public Works was running wild in their improvements in that section of the city, and, through fear of these lots becoming further involved in heavy taxes, he had sold them to Hallet Kilbourn, and I must look to him for the tax.

That affiant afterwards applied to the city authorities to have said lots advertised by the collector of the District of Columbia, in list of special taxes in default, at next annual tax sale, and after this made application for the assessment certificates or scrip against these said lots, and received them on or about March 9, 1872; said certificates bore date March 9, 1872, with interest on all at the rate of ten per centum from November 17, 1871, the date of the entry of said assessment on the special tax books of said city, and were signed by H. D. Cooke, governor, and John F. Cook, register. They were four in number aggregating $2,054.10, and each represented an installment of one-fourth of the whole tax (act corporation approved October 28, 1867). That affiant retained possession and ownership of said certificates until about October, 1873, when he sold them for value to Isaac S. Lyon, of Washington, D. C.

That recently, and since December 1, 1871, the attention of affiant has been called to the entry of the said improvement of lots 1 to 12, square 156, and the measurement thereof, upon the book of improvements for the first ward, by William Forsyth, surveyor District of Columbia, said entry appearing to have been made in November, in 1871, and affiant says in reference thereto, that he has no knowledge when said entry was made; that he made no promise

to Thomas Young, or any one for him, nor was there any understanding between affiant and said Thomas Young, directly or indirectly, that the entry of said work (when finished) on the records or special tax books of said city should be suspended for any length of time, by reason of said promise to pay, or for any other reason, nor did ever procure or advise such suspension, if any there was, or receive any compensation therefor.

· That affiant told Thomas Young that he would take immediate steps to have ten per cent. bearing scrip issued against said lots unless he paid as promised; that said Thomas Young was a friend of affiant, and expecting to receive from him cash in hand for said work, at more than market value of the scrip issued therefor, affiant trusted him for payment during his, Young's, absence, and until notified by him that he had sold said lots, and in the meantime made no inquiry or gave any attention to what the District of Columbia officials charged with duties connected with such work, had done, or had not done.

HENRY BIRCH.

The court below entered the following decree:

"This cause came on to be heard at the present term, was argued by the counsel for the respective parties, and upon due consideration thereof it appearing to the court that the complainant is not entitled to any relief upon his original bill, and that the defendant is entitled to relief under his cross-bill herein, it is by the court ordered, adjudged and decreed as follows, this 27th day of October, A. D. 1884.:

"That the amount of said assessment against said real estate, to wit, lots one, two, three, four, five, six, seven, eight, nine, ten, eleven and twelve, in square numbered one hundred and fifty-six, in the city of Washington, District of Columbia, for which said four certificates were issued to said Henry Birch, viz.: two thousand and fifty-four dollars and ten cents ($2,054.10), with interest thereon from November 17, 1871, at the rate of ten per centum per annum until October 5, 1881, and thereafter at six per cent. until paid,

be, and the same hereby is, adjudged and decreed to be a lien upon said real estate in favor of said Isaac S. Lyon; that said John B. Alley be, and he is hereby, allowed two months from this date within which to redeem said parcels of land, by paying unto said Lyon or his solicitor of record said sum of two thousand and fifty-four dollars and ten cents ($2,054.10), with interest as aforesaid, upon. which being done, said Lyon shall reconvey to said Alley, or his assigns, all his right, title, interest and estate in and to said parcels of land in fee-simple, and that said John B. Alley shall pay the costs of this cause, to be taxed by the clerk.

"Should said John B. Alley fail to redeem said real estate, as hereinbefore provided, then the same, or so much thereof as may be necessary, shall be sold for the payment of the amount of said lien, and William F. Mattingly is hereby appointed trustee to make said sale. The course of the proceeding shall be as follows: He shall first file in this cause his bond in the usual form in the penal sum of ten thousand dollars, with one or more sureties, to be approved by the court or one of the justices thereof, conditioned for the faithful performance of his duties as such trustee, under this and under any further order or decree that may be passed by the court in this cause. He shall sell said property at public auction, in front of the premises, after at least ten days' notice of the time, place and terms of sale by advertisement in one or more newspapers printed and published in the city of Washington, D. C., which said terms of sale shall be one-third cash and the balance in six and twelve months, with interest from the day of sale. Upon final ratification of any sale hereunder, and full payment of the purchase money, he shall convey the property sold unto the purchaser thereof in fee-simple, free from any interest therein of the parties to this cause, and shall bring the proceeds of sale into court, with a report of his proceedings hereunder under oath, to abide its further order or decree in the premises."

From this decree plaintiff appealed to the General Term.

. H. H· WELLS for complainant:

The various statutes under which these proceedings were had, and upon which their legality depends, are as follows:

The Board of Aldermen and Common Council of the city of Washington, passed an act on November 2, 1869 (under authority of an act of Congress of February 23, 1865), as follows:

"Be it enacted" * * * "That the mayor be, and he is hereby authorized and requested, to cause the curbstones to be set and the footways and gutters paved on the north side of P street north, between Sixteenth street west and Rock Creek; the work to be contracted for and executed in the manner and under the superintendence provided by law; and to defray the expenses of said improvement, a special tax, equal to the cost thereof, is hereby imposed and levied on all lots or parts of lots bordering on the line of the improvement; the said tax to be assessed and collected in conformity with the provisions of the act approved October 12, 1865." 67 Council, p. 116, Corp. Laws.

The act of October 12, 1865, referred to in the act quoted above (see page 3, 63 Council), recites the act of Congress of February 23, 1865, which gave the corporation power to levy taxes in particular wards, &c., and extends the provisions of the acts of May 23 and May 24, 1853, to special improvements thereafter made, and provides, that local improvements, unless otherwise provided for, shall be levied, assessed, collected and paid in the same manner as is provided by the last two acts.

The material parts of the two acts referred to, May 23, 1853 (Webb's Digest, page 155), and the act of May 24, 1853 (Webb's Digest, page 232), are as follows:

The first of the acts provides for proposals for setting curbs, petition for the improvement and plan of the property, time within which the improvement is to be made, and for the appointment of two assistant commissioners.

The assistant commissioners are provided for under the 5th section, which with the 6th section contains the only provisions important to be considered in this connection,

for they relate to the assessment. The substantial requirement of these sections is that, when the work is done, the commissioner of improvements shall deposit a statement with the register showing the cost of the work, a list of the persons from whom the tax is due, and the amount due from each person, and the register shall place such list of persons with the amount of tax in the hands of the collector, who shall give notice in writing to each person, and of the amount of tax claimed from each.

The act of May 24, 1853, provided for the appointment of commissioner of improvements, who, with the consent of the mayor, was to contract for improvements, and the assistant commissioners were to expend the appropriation, superintend the paving, but no contract should be made without the certificate of the mayor.

None of the provisions of that act are important in connection with this case.

The next act, that of June 10, 1867 (Webb's Digest, p. 467), is however important, for, after providing for the appointment of a superintendent and inspector of improvements, who is to prepare plats and fix grades, and to superintend paving of footways, the 5th and 6th sections of that act declare :

5. "All sewers, carriageways and footways, constructed under the provisions of this act, shall be under the exclusive control of the said superintendent and inspector herein provided for, with two assistant commissioners, to be appointed by the mayor, who shall be from among the persons residing on the line of the proposed improvement, or as near thereto as possible, and the mayor shall not pay any bills for work under contract until the same shall have been approved and the bills therefor signed by the superintendent and inspector, commissioner of the ward, and at least one of the assistant commissioners."

6. "The said superintendent and inspector shall also be charged with the duty of making all assessments on lots or parts of lots bordering on any street, alley or avenue which shall have been paved."

The last act on the subject, that of October 28, 1867, is as follows:

"Be it 'enacted," * * * "That from and after the passage of this act, all taxes assessed on private property for the construction of sewers, the paving of carriageways in avenues or streets, and for the laying of foot-pavements and gutters, curbing and paving alleys, shall be collected as follows: one-fourth of such assessment within thirty days after the service of the notice by the collector of taxes, and the remaining three-fourths in three equal annual payments, for which deferred payments it shall be the duty of the mayor to issue certificates of indebtedness, bearing interest at the rate of ten per centum per annum;" and the second section repeals all inconsistent acts.

On the 1st of April, 1870, Henry Birch contracted to make this improvement, and it is claimed that the work was done and approved on or before November 17, 1870, for which improvement an assessment was in fact made, which assessment was duly entered in the record book, and was signed by the then mayor, superintendent, commissioner, and the assistant commissioner, who certified to and approved the same, and a cancelling line was drawn through the page to show where the assessment stopped.

But lots 1 to 12 inclusive, were not upon this assessment and were not assessed, neither did the sheet or assessment referred to contain either the names of the person or persons owning these lots nor the lots themselves, nor the amount of tax claimed upon the lots, or of the owners.

On the 13th day of January, 1871, there was issued to Henry Birch fifty-two certificates of paving stock for the four installments, being for the entire amount claimed on all the property then on the assessment roll, which were signed by the proper officers of the corporation of Washington, but did not refer to either of the lots from 1 to 12 inclusive.

By the act of February 21, 1871, a new form of government was instituted, and the Board of Public Works succeeded to the powers and duties in respect to special taxes

of the corporation of Washington, and on the 1st of June, 1871, Emery, the mayor, Forsyth, superintendent and inspector, and the commissioner and assistant commissioners of improvements, who had before signed the assessment roll, ceased to hold office or to have any official power in respect to assessing taxes.

By section 37, act of February 21, 1871, the method of assessing and collecting the cost of special improvements was changed. The Board of Public Works, which was given entire charge of the subject, was required to assess upon the property adjoining and to be specially benefited by the improvement, "a reasonable portion of the cost of improvement not exceeding one-third," while under the old statute the entire cost was to be assessed on the property.

But in November, 1871, after the corporation of Washington had ceased, and its mayor and superintendent and inspector had gone out of office, and the assessment had been completed and the work paid for by the certificates as mentioned above, the cancelling line that marked the end of the list of the owners, and of the lots assessed, and of the assessment, was partially erased and in the space thus made, a description of lots from 1 to 12 inclusive, was entered, and the sum of $2,050 inserted against said lots, and as explanatory of such insertion, the following was written on said sheet:

"This work was done at this date, but by the request of the owner, not entered until November, 1871.

"WILLIAM FORSYTH,<br>
"*Surveyor, D. C.*"

Which interlineations constituted the only assessment ever made upon said lots.

The Thomas Young mentioned in the Forsyth memorandum remained the owner of these lots until he conveyed them to Kilbourn, on October 2, 1871, at which time there was no entry of any assessment, and Kilbourn purchased without notice, and was therefore an innocent purchaser.

On the 9th of March, 1872, four certificates were issued to

Henry Birch, as and for the cost and tax for making the improvement in question in front of lots 1 to 12 inclusive, which certificates gave the 17th of November, 1871, as the date from which interest was to be computed, and the only authority for the issuance of these certificates was the interlineation made in the ward book, as before stated.

The Board of Public Works was abolished June 20, 1874, but during its lifetime, to wit, from June 1, 1871, to June 20, 1874, it caused no assessment to be made, and the Commissioners of the District of Columbia, who succeeded, on the 20th of June, 1874, to the rights and duties of the Board of Public Works, made no assessment on said lots for such improvement, but on July 29th, 1875, Birch having assigned said four last named certificates to the defendant, Lyon, the District of Columbia and John F. Cook, collector, having advertised said lots for sale as delinquent, James M. Latta, who was then the owner of said lots, filed his bill in equity cause No. 4450, against the District of Columbia and Cook, collector, to enjoin the sale thereof, and a restraining order was granted on that day, which still continues in force.

On the 5th of October, 1881, the District of Columbia and John F. Cook, at the request of the defendant, Lyon, undertook to sell these lots, and Lyon bid in the said lots and received twelve certificates of sale, and paid for the same with his said four certificates, this sale being in violation of the restraining order above mentioned.

These certificates also bear interest as from November 17, 1871.

The bill in this case is in the nature of a bill of peace; it alleges the possession and title of the complainant, and asserts that Lyon claims some right or title in said lots, and that his claim throws a cloud and encumbrance upon the title of the complainant and his grantees.

Alley and his grantees are in adverse possession; they have a title in fee simple; the parties are numerous, and, therefore, there is no adequate remedy at law, but the whole question can be settled by one issue in equity, and this is,

therefore, the proper remedy. 3 Johns., 566; 6 Johns. Ch., 497; 8 Cr., 462; 3 Daniel's Ch. Prac., 1779; 1 McAllister, 113; Hemp., 692; 1 Black, 352.

This was the proper form of action, and though it prayed as an equitable and appropriate relief that the defendant be required to release his claim of title, the bill did not tender part payment, nor any payment, because, according to the theory of the complainant, there was no lawful assessment, no legal tax, and no part of the tax claimed was due any more than the whole of it.

The general doctrine as to the necessity of a tender in cases similar to this, is stated as strongly as anywhere else in State Railroad Tax Cases, 92 U. S., 575; at page 617, it is said: "Before complainants seek the aid of the court for relief from excessive tax they should pay what is due. Before they ask equitable relief, they should do that justice which is necessary to enable the court to hear them. * * It is not sufficient to say in the bill that they are ready and willing to pay whatever may be found due. They must first pay what is conceded to be due or what can be seen to be due on the face of the bill." And see National Bank vs. Kimball, 103 U. S., 732; Cooley on Taxation, 537; Clement vs. Everest, 29 Mich., 19; 7 Sawyer, 355; 32 Iowa, 271; 57 Iowa, 144; 46 Iowa, 150; 37 Iowa, 452; 41 Mich., 128; 87 Ill., 442.

These are cases of the same general character, and are not materially different in their principles from 92 U. S., 575.

The theory of the present case is that nothing is due; there was no legal assessment; there was no equitable obligation to pay anything. The complainant had bought the property, paying a full price, without any actual or constructive notice of any tax; no assessment or notice of the tax was in the tax office or upon the record where by law it was required to be placed, and the principle governing this class of cases is:

"Each step from the assessment of the land to the delivery of the deed must be taken; and in a controversy as to the title must be established by proof. * * * The gen-

eral doctrine is beyond question that the deed, until the prerequisites of the tax laws are established, is a nullity.   Burroughs on Taxation, 332, and cases; Blackwell on Tax Titles, 33, 34, 35, and cases; 4 Wh., 77; 18 H., 137; 2 Tenn., 372; 10 Mass., 17; 11 Mass., 220; 13 Mass., 282; 15 Mass., 144; 5 Conn., 190; 7 Conn., 550; 14 Ill., 223; 43 Ala., 633.

These cases are selected from the multitude which embrace almost every variety of conceivable defects.

In Thatcher *vs.* Powell, 6 Wh., 119, the court say, the execution by a public officer of a power to sell lands for the non-payment of taxes must be in strict pursuance of the law under which it is made, or no title is conveyed.

In Mason *vs.* Fearson, 9 How., 248, which was a case where at the sale more than enough lots were bid off to satisfy the tax, at page 260, the court says: "It is well settled that where a tax title is to be made out by a party.   *   *   *   It must be done in all material particulars fully, clearly.   *   *   *   In the language of some of the cases, it must be done 'strictly,' 'exactly,' 'with great strictness.'"

Where a statute requires a series of acts to be performed before the owners of property are properly chargeable with the tax, such acts are conditions precedent to the exercise of the power to levy the tax and all the requirements of the statute must be complied with or the tax cannot be collected. Hewes *vs.* Reis, 40 Cal., 255; Hilliard's Law of Taxation, p. 307, sec. 34; Games *vs.* Stiles, 14 Pet., 326; Burrows on Taxation, 203; Powell *vs.* Madison, 21 Ind., 535; Kimball *vs.* Merchants' S. L. & T. Co., 89 Ill., 611.

If the tax is not assessed within the time designated by law the assessment is void.   Billings *vs.* Dutton, 15 Ill., 215; Marsh *vs.* Chestnut, 14 Ill., 223; Mitchum *vs.* McInnis, 60 Miss., 945; Marsh *vs.* Supervisors, 42 Wis., 502.

In King *vs.* The District, Mac. A. & Mackey, 36, this court said:

"While it is doubtless the duty of the citizen to pay all taxes legally assessed upon him for the support of the government, yet the validity of proceedings taking his land

against his will, in discharge of his taxes, depends upon no consideration of equity but upon a strict compliance on the part of municipal officers, with the regulations previously prescribed by statute for the double purpose of securing the payment of the tax and of protecting the citizen against unnecessary sacrifice of his property."

And see also, Holt's Heirs vs. Hemphill's Lessees, 3 Ohio, 233; Stead's Ex'rs vs. Carnes, 4 Cran., 412; Chandler vs. Spear, 22 Vt., 388, citing Spear vs. Ditty, 9 Vt., 282; Bellaws vs. Elliott, 12 Vt., 569; Sumner vs. Sherman, 13 Vt., 909; Carpenter vs. Sawyer, 17 Vt., 122.

In Kneeland vs. City of Milwaukee, 18 Wis., 411, an act authorizing the laying of a sewer and required that a plan thereof should first be made and filed, which was not done. But the sewer was constructed and an assessment made. The court held that the making of the plan was a condition precedent, citing Merrick vs. LaCrosse, 17 Wis., 442, and says:

"It is a general rule when measures are authorized by statute in derogation of the common law which may result in divesting the title of one person to land and transferring it to another, that every requisite having the semblance of benefit to the owner must be strictly complied with." And cites Atkins vs. Kenna, 20 Wend., 241.

The provisions of the statute as to the form of warrants and tax lists and the place where lists shall be deposited are intended for the benefit of the tax payer. Sandwich vs. Fish, 2d Gray, 298.

The law (Secs. 5 and 6, Act of May 23, 1853) under which this tax was authorized, required, as we have before seen, that the commissioner of improvements shall deposit a statement with the register showing the cost of the work, a list of the persons from whom the tax was due, and the amount due from each person; and the register shall place such list of persons, with the amount of tax, in the hands of the collector, who shall give notice in writing to each person of the amount of tax claimed from each.

This provision of the statute is specific, precise and man-

datory. Every one of these requirements, in the language of the Supreme Court, "are intended for the protection of the citizens," and the omission of any one of them would render the tax sale void, for the list deposited with the register did not contain these lots from 1 to 12 inclusive. So, as to them, there was no statement of the cost, no list of the persons from whom the tax was due, no amount stated to be due from any person, and no such list as to them was placed in the hands of the collector.

If the case stopped here, of course it would be conceded that the whole proceeding as to these lots was null and void *ab initio;* but it is said that these commissioners, after they had made out their lists, which did not contain this property, and after the lists as made out had been signed, completed and filed, and certificates issued to the contractor in payment of all the tax mentioned therein, might proceed to alter, amend and add to said list other property not before included, and the names of persons not found on such completed list. Not only so, but they could make these additions and alterations, not only at any time after they had gone out of office, but at any time during their natural lives. This proposition seems as extreme and unreasonable as to be beyond the range of argument.

It will be remembered that these alterations of the list were made nearly a year after the list was completed; after the mayor, commissioner and assistant commissioner, as superintendent and inspector, who were required to sign the list and had in fact signed it, had gone out of office, and after the form of government under which the assessment was to be made had ceased, and after other officers had been empowered by law, under new methods, to make such assessments; and it will be remembered, too, that these additions and such alterations were subsequently made, not by said mayor, commissioner and assistant commissioners and said superintendent and inspector, or with the consent of said four officers, but only by Wm. Forsyth, without any consent of the other officers, and after he had ceased to be such superintendent and inspector.

Section 6, act of June 10, 1867, required that the assessment should be made by the superintendent and inspector. If there had been a change in the incumbent of that office, Forsyth being removed and a new one appointed, after such making of the assessment and filing thereof, but before the unauthorized and illegal alteration, which of the two could make such alteration? Certainly not both; and surely we should suppose it would be the incumbent of the office, because the power and duty attached to the office and not to the person.

"The assessor acts under a special and limited authority conferred by law and not by the owner of the estate. He is the mere instrument to pass the title. The proceeding is construed strictly, and the power must be strictly pursued in every particular. Every prerequisite to the power to sell the estate must precede its exercise." Davis vs. Farnes, 26 Texas, 296; Yunda vs. Wheeler, 9 Texas, 408; Robson vs. Osburn, 13 Texas, 298; Wafford vs. McKinney, 23 Texas, 36.

To justify the act of Forsyth complained of, we are compelled to assume that he could have made this entry at any time; that he could have kept, at the request of the owner or other party, or by agreement, the assessment off the record for an unlimited period, and implies his power to alter in a vital particular, a completed instrument and record duly signed; propositions that are against the whole current of authority.

In Hartwell vs. Littleton, 13 Pick., 229, the court say: "Of course an amendment could not be made by one who was no longer in office, as under such circumstances it would not be an official act."

Mr. Cooley says: "Corrections cannot be made by intendment, unless the necessary facts appear either in the record as actually made, or in official documents on file, from which the record should have been drawn up. Courts cannot imply facts which are not recited anywhere in the official proceeding." Cooley on Taxation, 234.

No amendment can make valid a tax sale that was void for want of a proper description of the land in the assess-

ment and subsequent proceedings. Cooley on Taxation, 242; People *vs.* Ward, 105 Ill., 620; O'Connor *vs.* Mullen, 11 Ill., 57–116; Langdon *vs.* Poor, 20 Vt., 13; Judevine *vs.* Jackson, 18 Vt., 470; Atkins *vs.* Hinman, 2 Gilman, 451; Blackwell on Tax Title, 359–362, and cases; Blight *vs.* Barks, 6 Monroe, 206; Blight *vs.* Atwell, 7 Monroe, 268.

This extraordinary and illegal method opened the door to unlimited frauds, for when Alley's grantor bought there was no record, note or memorandum of this tax in the tax office or the records thereof from which he could learn of the encumbrance, and it was a fraud upon his rights to allow an assessment to be subsequently made and put upon the record, and that to be done by the District through its officers in confederation with Young, the then owner of the property, who, by the device, relieved himself from the tax and undertook to transfer it to his grantee without notice.

The position of Birch, by whom the work was done, and to whom the certificates were finally issued, was this: He, by taking Young for the price, and withholding the property from assessment, was estopped from calling upon the subsequent purchaser without notice, and whatever fraud he was chargeable with, Lyon is also charged with; for at the time he purchased the certificates, the record disclosed the fact that the property had thus been illegally withheld from assessment.

If there had been an accidental omission of property from the tax list without the fault of Birch whereby he might lose some part of the contract price for making the improvement, the remedy would have been convenient and adequate, for if the tax was a legal charge, an application might have been made for an assessment, such as is provided for by the 13th section of the act of March 3, 1883: "If the assessor of the District shall learn that any property liable to taxation has been omitted from the assessment for any previous year or years or has been so assessed that the assessment was void, it shall be his duty to re-assess," on the assumption that the property was originally chargeable

for the improvement; and while the amount could not be collected by a forced sale, it could be by a proper proceeding in court; but in no event could this extraordinary method be resorted to.

WILLIAM F. MATTINGLY for defendant:

The act of the 67th Council, ch. 236, approved November 2, 1869, authorized the work to be done, and *imposed* and *levied* a tax to pay for it on all lots bordering on the line of the improvement. The work was done according to contract and has never been paid for.

The lien is from the levy or time of ordering the work, although the amount is not ascertained until afterwards. Blakie *vs.* Hodson, 117 Mass., 181; Carr *vs.* Dooley, 119 Mass., 294; 40 N. Y., 513; Jones *vs.* Boston, 104 Mass., 461.

The tax was properly assessed on these lots, notwithstanding the delay in entering the assessment. Mills *vs.* Gleason, 11 Wis., 515.

The tax was assessed on the books in the office of the collector of taxes against these lots at the time of the purchase by Alley and he had constructive knowledge of it.

He who seeks equity must do equity, and in cases of this kind a complainant seeking the aid of a court of equity must pay the amount of tax and interest before the burden will be removed from his property. High on Inj., sec. 497; Morrison *vs.* Huskin, 32 Iowa, 278; Dudley *vs.* Little, 2 Hammond, 504; Barrett *vs.* Cline, 60 Ill., 205; Stewart *vs.* Mayor, etc., 54 Md., 454; Phelps *vs.* Harding, 87 Ill., 442; State R. R. Tax Cases, 2 Otto, 616.

The lien of this tax was created by the law authorizing the work to be done and nothing has since transpired to remove the lien.

The equitable doctrine of a purchaser with notice standing in the shoes of a prior vendor without notice, has no application to liens for taxes created by law. Cooley on Taxation; Black. on Tax Sales.

Mr. Justice MAC ARTHUR delivered the opinion of the court.

A majority of the court who heard the argument have come to the conclusion that the decree made in this case ought to be reversed.

The bill is filed for the purpose of removing a cloud upon the title to real estate of the plaintiff, created by a special improvement tax title.

Mr. Alley became the purchaser of these lots, and has filed a bill to remove the cloud of which he complains. The printed statement of counsel collates the statutes which relate to the imposition of taxes for special improvements. It would take some time to analyze these statutes, and perhaps it is unnecessary to do so, because we think a very brief statement of the system can be made without referring to them in detail.

The work was performed in 1870, under the act of the common council of the corporation of Washington, that was passed on the 2d of November, 1869; and it is conceded that that ordinance was in conformity to an act of Congress authorizing the common council to make local improvements and to lay and collect taxes upon the lots. upon the line of work.

At that time the first step in the process was an ordinance by the common council, and the ordinance in the present case designated the place where the improvement was to be made, on P street, on the north side, between Sixteenth street and Rock Creek. To defray the expenses, a special tax equal to the amount of the cost was thereby levied upon the lots bordering upon the improvement. The ordinance also provided that that tax should be assessed and collected in conformity with the provisions of the act of October 12, 1865.

Other ordinances provided for the appointment of a superintendent and inspector of streets, who was to make plats, fix the grades, superintend the work, and make assessments upon the lots to defray the cost of the work.

The ordinances required the appointment by the mayor

of two assistant commissioners, to be selected from the line of the improvement, and they were to supervise, with the superintendent and inspector; and control the work as it progressed, and the mayor was to pay no bills for this work unless they were signed by these commissioners and by the superintendent.

When the work was completed, the inspector and superintendent was charged with the duty, as I have stated, of making the assessment, of summing up the aggregate expense of the work, of stating the amount due from each person, and he was required to deposit this roll of assessment with the register (an officer which no longer exists), and the register was then to put it into the hands of the collector. It then became the duty of the collector to enter it upon what was called a tax ledger, kept in his office, and notify the parties of the amount due from each within thirty days.

This appears to have been the process at that period of levying taxes for such improvements.

This work was authorized in November, 1869, and the act which authorized it laid and levied the tax. The contract was given to Mr. Birch, who was a professional paver, to pave and curb between Sixteenth street and Rock Creek, on the north side of P street north. He entered upon the execution of his contract, and completed it in November following. Mr. William Forsyth was the superintendent and inspector; he prepared the statement for assessment, which I have already described, upon the conclusion of the work, and deposited it with the proper officer, the register, who placed it in the hands of the collector; it was then entered on the tax ledger, and presumably he gave the notices and collected the tax.

Now, the lots in question were omitted from that assessment.

This assessment bore the signatures of the street inspectors, and of the mayor. It bears date on the 17th of November, 1870. The lots are specified, so much for paving, so much for grading, so much for curbing, and so much for

guttering. Each of these items being in a separate column, and then the total amount is carried out.

It is executed by William Forsyth, superintendent of streets, by Hiram Brown, D. M. Davis and Robert Armor, assistant commissioners, and on the corner it is approved by M. G. Emery, mayor.

The lots in question are upon the line of this improvement, and they are numbered from one to twelve, between Seventeenth and Eighteenth streets, on the north side of P street, and it is admitted that they were not entered upon this statement at that time nor until a year afterwards. There is a memorandum which embraces lots from one to twelve in red ink, and which reads:

"This work was done at this date, but at request of the owner not entered until November 17, 1871."

And that is signed, William Forsyth, surveyor.

Between the completion of the work and the execution of this memorandum, public events of considerable importance in the District had occurred. The old corporation had been extinguished, and a District government had been established with new officers, and with provisions in regard to improvements that varied somewhat from those that had preceded it.

It is of vital importance in this case to bear in mind that, at the time the sheet was deposited with the register, there was no mention of these lots.

It appears that Thomas Young, at the time of the improvement, was the owner of the property. He entered into an agreement with the contractor to pay him ninety per cent. of the contract price, and the inducement was that that was more than the contractor would have realized from the sale of the certificates in the market.

About this arrangement there appears to be no dispute. But from the entry it would appear that the owner had requested the superintendent not to make it, and that inference is very natural in view of the arrangement to pay for the work.

Mr. Young, becoming somewhat alarmed at the extensive

improvements that were then going on, withdrew from this agreement and notified the contractor that he would not stand by it.   In the meantime, on the 12th of October, 1871, Young conveyed the lots to Hallett Kilbourn.   That was just one month before the entry was made in red lines.

The complainant states in his bill that Kilbourn searched the assessment rolls and found that these lots were not assessed, that he had no knowledge of any lien resting upon the property, and that the purchaser was a *bona fide* purchaser without notice.   Kilbourn then conveyed to Latta, Latta conveyed to Sunderland, and Sunderland to plaintiff who took and recorded his title some time in April, 1881, long, however, after the entry in the red ink had been made.   But he claims that he took the title unaffected by this assessment, just as Kilbourn did.

And the question is whether the lien to defray the expense of the improvement attached itself in such a way as to affect Mr. Kilbourn with notice.

I have stated that the ordinance of the common council authorizing this work to be done, levied and assessed a tax to defray its expense, and we are all agreed that that constituted a lien upon the property.

It is, however, provided in the act, that the tax shall be assessed and collected in conformity with the provisions of the acts which I have already enumerated.   Until this is done it is very clear that the lien created by the act authorizing the work is inchoate, and that it does not become complete and absolute until the assessment or statement is made by the proper officer.

How can that affect this case ?   The assessment for the work had been made ; it had been made by the proper officer, and there is no fault found with it.   That assessment does not exhibit the lots in question as being subject to any lien or to any assessment, and it is stated in the bill that Kilbourn purchased without any constructive or actual notice of the lien of the assessment.

It is to be remembered that the assessments of these lots were not omitted by mistake, or through ignorance or from

negligence, but their omission appears to have been intentional and at the request of the party then owning the lots.

Now, can it be possible that the municipal authorities can withhold purposely an assessment at the request of anybody, to the injury of a *bona fide* purchaser? We think not. We are of opinion that Kilbourn having exercised all the diligence which is required of a *bona fide* purchaser, takes his title free and clear of this tax.

The law requires that a record shall be made of the assessment and it designates the place where this record is to be found. There is no other place to which parties can resort for information. Having exhausted all the information that the law puts them in possession of, we think they have met the obligations required of an honest purchaser.

A position was taken that the party should be required to pay the tax due before he can ask this court to remove the cloud upon his title. That is a very well established doctrine both in this court and in the Supreme Court of the United States in a proper case, and if Mr. Young, the owner of the property, were here seeking to get rid of this tax and this cloud, on account of the fact that the assessment was not made properly, we should require him to come into court with the amount of the tax before granting him any relief.

But Kilbourn does not stand in that position at all. He is a *bona fide* purchaser, and it is on account of this assessment having been intentionally withheld from the assessment roll that he made the purchase and paid the value of the land.

If this be the case, and I do not see that there is any escape from it, he has paid this tax once in the purchase of the land, and it would be inequitable to call upon him to pay it again.

We do not think, therefore, that this is a case in which that doctrine can be applied.

We are, also, of opinion that Mr. Alley takes all the title that Kilbourn did. It appears that Mr. Alley received from the District government $788, less or more, as a drawback for material that had been used in this improvement, after

.he became the owner of the land, and it is said that he is estopped by that circumstance.

While we are not disposed to adjudicate to whom the $788 belongs, we doubt very much if it belongs to Mr. Alley. The District of Columbia, who paid it, is not a party to this proceeding. If the District were here we would probably be inclined to direct him to return it. But we do not think that that affects his title to this property at all. That is a matter in controversy between the parties who may be entitled to it, and so we think our decision ought not to be influenced by it.

For these reasons, the court are of opinion that the decree below is erroneous and should be reversed.

Mr. Justice JAMES, dissenting, said:

I have some difficulty, on certain points, in concurring in the opinion of the majority, and I shall state my reasons very briefly.

Congress gave to the corporation of Washington the power to order these improvements and to charge them upon the land. Under that power they passed this act:

"That the mayor be, and he is hereby authorized and requested to cause the curbstones to be set, and the footways and gutters to be paved, on the north side of P street north, between 16th street west and Rock creek; the work to be contracted for and executed in the manner and under the superintendence provided by law; and to defray the expenses of said improvement, a special tax equal to the cost thereof is hereby imposed and levied on all lots or parts of lots bordering on the line of the improvement; the said tax to be assessed and collected in conformity with the provisions of the act approved October 12, 1865."

We find in the act of 1865 a reference to earlier acts, and the whole system is laid out plainly.

Now, I think we have agreed as to the effect of this statute, but I lay more emphasis on it than my brethren. The effect of this ordinance was to charge this property with a burden. The assessment was for the ascertainment of the quota of

each lot, but the charge was there perfect and absolute. I lay that down more strongly than my brethren. The legal liability of the lot for the tax, the amount of which was to be ascertained, was perfect and cannot be moved by any omissions.

What then was the position of this purchaser when he took these lots? He found there was no assessment, but he was warned that the lots were liable. There was perfect evidence that the lots were liable, and he had no knowledge that that liability had been discharged, nor any right to presume that it had been. I am not aware that there is any presumption of law, after you prove an indebtedness, that it is paid. You prove first the debt, and there is a presumption of its continuance.

Then this purchaser had knowledge through this ordinance that there was absolutely a charge on this property. It is true it nowhere appeared that the proportion of each lot had been assessed upon it; but it did appear that the lot was under a charge for whatever its proportion might be.

We find certain proceedings taken afterwards by the claimant of this charge, the owner of this property, which are held to be irregular. There was no assessment on these lots at the time when the assessment was made on the other fifteen lots in the same square. It is said that the assignor of the present defendant had something to do with keeping it off the record. We have been furnished with a stipulation in which it appears as one of the facts, that that was done at the request of Mr. Young, the owner of the lots. It is not asserted that it was done by Mr. Birch. Birch says—and I do not find him contradicted anywhere—that he made no stipulation (no bargain, is his language) for any specific time. It is only a piece of guess work, from the general language of his affidavit, as to whether he made any contract to keep it off. The evidence is, that the owner of the lots asked the superintendent and inspector, or perhaps went to the register, and asked him to keep it off the assessment list, and it was kept off.

But all the world was advised that there was a charge on

this property, and they had no information that that charge had been taken off.

That charge, whether ascertained by assessment or not, has been assigned to this defendant, and the plaintiff comes here asking relief against the defendant, who owns a charge on this property. The amount was not ascertained by the assessment, but it was a charge nevertheless. It was not what I call inchoate, though my brethren so view it. It was a charge the exact amount of which was not yet ascertained, but, nevertheless, a perfect charge. And in this bill he asks for relief against a man who has an ascertainable charge upon his property, without offering in any way to settle with him.

Now, the defendant is not entitled himself, as I should say, to the benefits of a certificate of indebtedness bearing ten per cent., but I should require the party to pay the defendant the charge that he owns on the plaintiff's property, with six per cent. interest, before I would give him any relief. The amount can be ascertained, and it is fairly ascertained here. It is the balance of the whole, because after the equity of the other fifteen lots is ascertained, we know exactly what it is. It is $2,045 of original liability. I do not see why the plaintiff is entitled, when we have got this whole matter here, to say that just because this is a cloud, and because he can demonstrate that the legal title claimed by the defendant ought to be brushed away, that he will have that done first, and leave this very defendant afterwards to take steps for the ascertainment of his rights when we know now what they are.

These are the grounds upon which I am compelled to dissent from the conclusion of my colleagues. If the plaintiff will pay this debt he will be entitled to relief, because, I think, this title by purchase cannot stand. But I do not think we ought to help a man, who is in debt more or less to the very party against whom he is asking relief, unless he offers to pay what is justly due.